Case 3:26-cv-01244-JEP-SJH    Document 16    Filed 07/13/26    Page 1 of 53 PageID 140

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| CJ'S POWER SYSTEMS, INC., a Florida corporation, and PARAMOUNT POWER, INC., a Florida corporation,<br><br>       Plaintiffs,<br><br>v.<br><br>SANTO MARINO, JR., an individual, CAVAN ELECTRIC, INC., a Florida corporation, and AUBREY EDGE, an individual,<br><br>       Defendants. | **Case No.: 3:26-cv-01244-JEP-SJH**<br>**FIRST AMENDED VERIFIED COMPLAINT**<br>**(Injunctive Relief Demanded)**<br>**JURY TRIAL DEMANDED** |

Plaintiffs CJ'S POWER SYSTEMS, INC. ("CJ's") and PARAMOUNT POWER, INC. ("Paramount," and together with CJ's, the "Plaintiffs"), by and through their undersigned counsel, hereby file this First Amended Verified Complaint against Defendants SANTO MARINO, JR. ("Marino"), CAVAN ELECTRIC, INC. ("Cavan"), and AUBREY EDGE ("Edge," and together with Marino and Cavan, the "Defendants"), and allege upon personal knowledge as to their own acts and upon information and belief as to all other matters as follows:ar

**INTRODUCTION**

1. This is an action for injunctive relief and damages arising out of Defendant Santo Marino, Jr.'s flagrant breach of his binding non-competition, non- solicitation, and confidentiality obligations to Plaintiffs CJ's Power Systems, Inc. ("CJ" or "The Company") and Paramount Power, Inc., ("Paramount") (together "the Companies") and out of the knowing and intentional interference with those obligations by Defendants Cavan Electric, Inc. and its principal owner, Aubrey Edge.

1

2.   Plaintiffs are leading providers of generator sales, installation, and service throughout the State of Florida and elsewhere in the United States. Over the course of many years, Plaintiffs have invested substantial time, resources, and capital developing customer relationships, vendor partnerships, pricing models, software systems, source codes, customer lists, business methods, goodwill, and other proprietary and confidential business information that constitute the lifeblood of Plaintiffs' business.

3.   Marino was, until October 9, 2025, a key employee of Plaintiffs entrusted with broad access to Plaintiffs' most sensitive confidential information, customer relationships, and pricing strategies. As a condition of, and in consideration for, his employment and continued employment, Marino voluntarily executed three separate written agreements protecting Plaintiffs' legitimate business interests: (i) a Non-Disclosure Agreement dated January 31, 2022; (ii) a Confidentiality, Non-Solicitation, and Non-Competition Agreement dated January 31, 2022 (the "Non-Compete Agreement"); and (iii) a License Utilization and Consulting Agreement dated October 6, 2025, in which Marino expressly reaffirmed and ratified his existing non-competition and non-solicitation obligations.

4.   Notwithstanding these binding obligations, Marino has flagrantly breached every material term of his agreements. Among other things, Marino has: (i) accepted employment, consulting, and a qualifying-agent licensing relationship with Defendant Cavan, a direct competitor of Plaintiffs operating in Florida; (ii) registered his individual Florida electrical contractor license to qualify Cavan to perform competitive work in Florida; (iii) solicited and serviced Plaintiffs' customers; (iv) solicited and recruited Plaintiffs' employees, including, without limitation, Brandon Vallario and David Sherman; (v) interfered with Plaintiffs' vendor relationships; (vi) misappropriated, retained, and used Plaintiffs'

2

confidential business information and trade secrets in connection with his competitive activities at Cavan; and (vii) converted approximately $4,800 in Hilton Honors points earned through Plaintiffs' business expenditures.

5. Defendants Cavan and Edge, having been placed on actual written notice of Marino's binding restrictive covenants on multiple occasions, including by direct correspondence to Edge personally, have nevertheless intentionally elected to continue to employ, retain, and benefit from Marino's services—in conscious and willful disregard of Plaintiffs' contractual rights, thereby tortiously interfering with Plaintiffs' contracts and unfairly competing with Plaintiffs in the Florida marketplace.

6. Defendant Edge is, upon information and belief, the principal owner and controlling person of Cavan. As Cavan's principal, Edge personally received written notice of Marino's restrictive covenants and of Cavan's tortious interference, was personally invited to remediate the unlawful conduct, and personally elected—as the decisional authority over Cavan—to continue Cavan's unlawful conduct and to continue employing Marino. Edge's personal participation in, direction of, and authorization of the tortious interference subjects him to personal liability under Florida law.

7. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered and continue to suffer substantial monetary damages, including, without limitation, lost profits exceeding $2,187,488.00 from active jobs diverted away from Plaintiffs and lost work-order quotes exceeding $3,143,768.97, in addition to ongoing and irreparable harm to Plaintiffs' goodwill, customer relationships, vendor relationships, workforce, and competitive position in the marketplace.

8. Plaintiffs bring this action seeking emergency, preliminary, and permanent injunctive relief, compensatory damages, treble damages, exemplary damages, punitive damages, disgorgement of all ill-gotten profits, attorneys' fees and costs, and such further relief as set forth herein.

## THE PARTIES

9. Plaintiff CJ's Power Systems, Inc. ("CJ's") is, and at all times material hereto was, a corporation duly organized and existing under the laws of the State of Florida, with its principal place of business located at 132 NE 17th Place, Ocala, Florida 34470. CJ's is engaged in the business of generator sales, installation, and service throughout the State of Florida and elsewhere in the United States.

10. Plaintiff Paramount Power, Inc. ("Paramount") is, and at all times material hereto was, a corporation duly organized and existing under the laws of the State of Florida, with its principal place of business located at 2788 Fairfield Avenue South, St. Petersburg, Florida 33712. Paramount is an affiliate of CJ's and is engaged in the same generator sales and service business.

11. Defendant Santo Marino, Jr. ("Marino") is, upon information and belief, an individual and citizen of the State of Florida who resides at 3316 N Silvertree Way, St. Augustine, Florida 32086, and/or 16148 Hampton Crossing Drive, Winter Garden, Florida 34787. Marino was employed by Plaintiffs from on or about January 31, 2022 through October 9, 2025.

12. Defendant Cavan Electric, Inc. ("Cavan") is, upon information and belief, a corporation duly organized and existing under the laws of the State of Florida, with its principal place of business located at 2201 Edison Avenue, Jacksonville, Florida 32204. Upon information and belief, Cavan is engaged in commercial and industrial electrical contracting and, since

4

at least February 23, 2026, has been engaged in generator-related work in direct competition with Plaintiffs through the unlawful use of Marino's services and licensure.

13. Defendant Aubrey Edge ("Edge") is, upon information and belief, an individual and citizen of the State of Florida. Upon information and belief, Edge is the principal owner of Cavan, exercises ultimate ownership, oversight, and control over Cavan's business operations, and personally authorized, directed, ratified, and participated in the tortious conduct alleged herein. Edge is, upon information and belief, also affiliated with Daily's, a separate Florida-based business enterprise, and is regularly contacted at the email address aedge@dailys.com.

14. At all times material hereto, Edge was a controlling principal of Cavan with the actual authority and ability to direct Cavan's hiring decisions, employment decisions, and overall business operations, including the decision to engage and retain Marino, Brandon Vallario, and David Sherman.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert a claim arising under the laws of the United States, namely, the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq. (the "DTSA").

16. This Court has supplemental jurisdiction over Plaintiffs' related state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiffs' federal DTSA claim that they form part of the same case or controversy under Article III of the United States Constitution.

17. This Court has personal jurisdiction over Defendant Marino because Marino is a citizen and resident of the State of Florida, regularly transacts business in the State of Florida, has

5

committed tortious acts within the State of Florida giving rise to the claims asserted herein, and contractually consented to jurisdiction in Florida pursuant to the Non-Compete Agreement.

18. This Court has personal jurisdiction over Defendant Cavan because Cavan is a Florida corporation with its principal place of business in Florida, regularly transacts business in the State of Florida, and has committed tortious acts within the State of Florida giving rise to the claims asserted herein.

19. This Court has personal jurisdiction over Defendant Edge because Edge is a citizen and resident of the State of Florida, owns and controls a Florida corporation with its principal place of business in Florida, regularly transacts business in the State of Florida, and has personally committed tortious acts within the State of Florida giving rise to the claims asserted herein.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because (i) all Defendants reside in this judicial district within the meaning of 28 U.S.C. § 1391(c); and (ii) a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district. Specifically, Cavan is headquartered in Jacksonville, Florida, Marino resides in St. Augustine, Florida, Marino's qualifying-agent license was registered to Cavan in Jacksonville, Florida, and a substantial portion of the competitive misconduct alleged herein has occurred and continues to occur in this District.

21. Assignment to the Jacksonville Division is proper pursuant to Local Rule 1.04 because Defendant Cavan is headquartered in Jacksonville, Marino is licensed and currently performing competitive work in this Division, and a substantial portion of the events giving rise to this action have occurred in this Division.

## DEMAND FOR JURY TRIAL

22. Plaintiffs respectfully demand a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b) and the Seventh Amendment to the United States Constitution.

## FACTUAL ALLEGATIONS

### A. Plaintiffs' Business and Confidential Information

23. CJ's and Paramount are well-established providers of generator sales, installation, and service in Florida and throughout the United States. Plaintiffs have built their reputation and goodwill over many years through significant investment of time, money, and effort.

24. In the highly competitive generator sales-and-service industry, Plaintiffs have developed and maintain a substantial body of confidential and proprietary business information, including, without limitation: (i) detailed customer lists, customer contact information, customer pricing histories, and customer purchasing patterns; (ii) vendor lists, vendor pricing arrangements, and exclusive vendor relationships; (iii) financial information, profit margins, and pricing models; (iv) software programs, passwords, and source codes; (v) trade secrets relating to methods of business operation; (vi) marketing strategies and prospective-customer pipelines; (vii) employee compensation and personnel data; and (viii) operational know-how and business methods (collectively, the "Confidential Information").

25. The Confidential Information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper

7

means by, other persons (including Defendants) who can obtain economic value from the disclosure or use of such information.

26.    Plaintiffs have taken, and continue to take, reasonable measures to maintain the secrecy of the Confidential Information, including, without limitation: (i) limiting access to the Confidential Information to those employees and consultants with a legitimate need to know; (ii) maintaining the Confidential Information on password-protected computer systems and networks; (iii) requiring key employees and consultants to execute written confidentiality, non-solicitation, and non-competition agreements as a condition of, and in consideration for, their employment or engagement; and (iv) marking sensitive materials as confidential where appropriate.

**B. Marino's Employment and the Restrictive Covenants**

27.    On or about January 31, 2022, Marino commenced employment with CJ's and Paramount in a position of substantial trust and responsibility, with broad access to the Confidential Information and to Plaintiffs' customer relationships, employee relationships, and vendor relationships.

28.    As a condition of, and in consideration for, his employment, Marino voluntarily executed two written agreements with Plaintiffs on January 31, 2022:

29.    (a) the Non-Disclosure Agreement (the "NDA"), pursuant to which Marino agreed, among other things, to maintain in strict confidence all confidential information of Plaintiffs and their affiliated entities, not to use such confidential information for any purpose other than the legitimate business of Plaintiffs, and not to circumvent Plaintiffs in any business relationship; and

8

30.  (b) the Confidentiality, Non-Solicitation, and Non-Competition Agreement (the "Non-Compete Agreement," and together with the NDA, the "Restrictive Covenants"), pursuant to which Marino agreed to a comprehensive set of confidentiality, non-solicitation, and non-competition obligations protecting Plaintiffs' legitimate business interests.

31.  True and correct copies of the NDA and the Non-Compete Agreement are attached hereto as Exhibit "1" and Exhibit "2," respectively, and are incorporated herein by reference.

32.  Pursuant to Section 3 of the Non-Compete Agreement, Marino agreed, among other things, that he would: (i) keep all Confidential Information confidential and not, during or at any time after the termination of his employment, publish, disclose, divulge, or make accessible such Confidential Information to others; (ii) not use or generate benefit from such Confidential Information except during employment with and for the benefit of Plaintiffs; and (iii) return all tangible evidence of such Confidential Information to Plaintiffs at or prior to the termination of his employment.

33.  Pursuant to Section 4 of the Non-Compete Agreement, Marino agreed that, during his employment and for a period of two (2) years following termination of his employment for any reason, he would not, directly or indirectly: (a) engage, hire, employ, or solicit any employee of Plaintiffs or otherwise induce any employee to leave Plaintiffs' employ; (b) solicit any vendor or customer of Plaintiffs or interfere with Plaintiffs' relationships with any of their customers, prospective customers, or vendors with whom Marino had a substantial relationship; or (c) accept the business of or provide services for any vendor, customer, or prospective customer of Plaintiffs with whom Marino had a relationship.

34.  Pursuant to Section 5 of the Non-Compete Agreement, Marino further agreed that, during his employment and for a period of two (2) years following termination of his employment

for any reason, he would not, in any way, compete against Plaintiffs or accept employment or establish any business relationship (including a consulting or licensing relationship), directly or indirectly, with any business entity in competition with Plaintiffs or that plans to be in competition with Plaintiffs. Section 5(a) defines "in competition with Employer" to include, without limitation, "engaging in or assisting in the marketing, distributing, selling, generator sales and Installation for clients and customers." Section 5(c) provides that Plaintiffs compete throughout the State of Florida.

35.    Pursuant to Section 6 of the Non-Compete Agreement, the time restrictions applicable to Sections 4 and 5 are tolled during any period of breach by Marino. Pursuant to Section 7, Marino expressly acknowledged and agreed that any breach or threatened breach of Sections 3, 4, and 5 would cause irreparable harm to Plaintiffs for which the remedies at law would be inadequate, and that Plaintiffs would be entitled to injunctive relief without notice and without bond.

36.    Pursuant to Section 10 of the Non-Compete Agreement, the prevailing party in any action arising under the Non-Compete Agreement is entitled to recover its costs and attorneys' fees, including pre-suit, investigative, and appellate fees. Pursuant to Section 13, the Non-Compete Agreement is governed by Florida law.

**C. The October 2025 Reaffirmation**

37.    On or about October 6, 2025—after Marino had given notice that he intended to leave his employment with Plaintiffs—Marino executed a written License Utilization and Consulting Agreement with CJ's and Paramount (the "License Agreement"). A true and correct copy of the License Agreement is attached hereto as Exhibit "3" and is incorporated herein by reference.

10

38. Marino was compensated for executing this License Agreement.

39. Section 6 of the License Agreement, captioned "Non-Compete and Non-Solicitation," expressly reaffirms and ratifies Marino's pre-existing obligations under the Non-Compete Agreement. Section 6.1 provides that "the Parties acknowledge that the License Holder has previously executed a Non-Compete and Non-Solicitation Agreement." Section 6.2 provides that "Nothing in this Agreement shall be deemed or construed as a waiver, release, or modification of those obligations, which remain in full force and effect."

40. By executing the License Agreement on October 6, 2025, Marino expressly acknowledged in writing that he was aware of, bound by, and committed to honoring his pre-existing non-compete and non-solicitation obligations to Plaintiffs.

41. Pursuant to the License Agreement Marino was to receive two thousand dollars a month as consideration for the use of Marino's license.

42. Plaintiff has in fact paid Marino pursuant to the terms of agreement from the date upon which it was signed through the end date of June 26, 2026 for a total of $16,743.12.

## D. Marino's Departure and Misrepresentations

43. Marino's employment with Plaintiffs terminated effective October 9, 2025.

44. By operation of the Non-Compete Agreement and the License Agreement, Marino's restrictive covenants remain in full force and effect through, at the earliest, October 9, 2027, subject to tolling for any period of breach.

45. Upon his departure, Marino represented to Plaintiffs that he would be working for a construction company—and not for any business in competition with Plaintiffs. Those representations were false when made, and Marino knew them to be false when made. In

truth and in fact, Marino had already taken steps, or was actively planning to take steps, to compete directly with Plaintiffs through Cavan.

46. Plaintiffs reasonably relied upon Marino's misrepresentations regarding his post-departure plans, and as a result, Plaintiffs were induced to forbear from taking immediate protective measures, including without limitation seeking immediate injunctive relief at the time of Marino's departure.

47. While still employed by Plaintiffs, and while continuing to receive compensation from Plaintiffs, Marino was actively preparing to leave Plaintiffs and to compete against them. In or about August and September 2025, Marino used his Plaintiff-issued computer to conduct repeated searches for competing employment, including searches for "Electrical Project Manager" and "Generator Project Manager" positions in the Jacksonville, Florida area, on job-search platforms including ZipRecruiter, LinkedIn, and Indeed. Marino conducted these searches during the very period in which he negotiated and executed the October 6, 2025 License Agreement reaffirming his non-competition and non-solicitation obligations, and in which he represented to Plaintiffs that he would not be competing against them.

**E. Marino's Breach of the Restrictive Covenants and Engagement with Cavan**

48. Notwithstanding his binding contractual obligations under the Restrictive Covenants and his October 6, 2025 written reaffirmation of those obligations, Marino has, since at least October 9, 2025, engaged and continues to engage in widespread and willful breaches of the Restrictive Covenants.

49. On or about February 23, 2026, the State of Florida Department of Business and Professional Regulation, Electrical Contractors' Licensing Board, issued license number

EC13015904 to Marino as the qualifying agent for Cavan Electric, Inc. The issuance of this license demonstrates that Marino has accepted a licensing, employment, and/or consulting relationship with Cavan, in direct violation of Section 5 of the Non-Compete Agreement. A true and correct copy of the license is attached hereto as Exhibit "4" and is incorporated herein by reference.

50. Upon information and belief, since on or before February 23, 2026, Marino has been employed by, has consulted for, and/or has otherwise contracted with Cavan in a capacity that places Marino in direct competition with Plaintiffs within the State of Florida, including by qualifying Cavan to perform generator-related electrical contracting work in Florida.

51. Upon information and belief, since at least October 9, 2025, Marino has solicited and/or accepted business from one or more of Plaintiffs' customers with whom Marino had substantial relationships during his employment with Plaintiffs, and Marino, individually and through Cavan, has serviced one or more of Plaintiffs' customers using Plaintiffs' Confidential Information.

52. Upon information and belief, Marino, individually and on behalf of Cavan, has solicited employees of Plaintiffs to leave their employment with Plaintiffs and to accept employment with Cavan. Specifically, upon information and belief, Marino solicited and recruited Brandon Vallario—a former CJ's employee who himself was bound by his own February 2025 Confidentiality, Non-Solicitation, and Non-Competition Agreement with CJ's—to leave CJ's and accept employment with Cavan.

53. David Sherman, another CJ's employee, has confirmed Marino's solicitation of Plaintiffs' personnel. Sherman left Plaintiffs to work with Marino at Cavan; after Cavan later

13

terminated him, Sherman contacted the company to ask to return to employment with CJ's. Sherman disclosed to the company that Marino had solicited and recruited him to leave Plaintiffs, and that—to conceal that Sherman's move to Cavan resulted from Marino's solicitation and to create the false appearance that Sherman was employed elsewhere—Marino directed Sherman first to take a temporary job with another employer, so that Sherman would appear to be working somewhere other than Cavan, after which Marino would hire Sherman at Cavan, as Marino thereafter did. Marino's solicitation of Sherman occurred in or about February and March of 2026.

54.    Upon information and belief, Marino has interfered with Plaintiffs' vendor relationships, including by soliciting one or more of Plaintiffs' exclusive or longstanding vendors to provide goods or services to Cavan.

55.    Plaintiffs have suffered substantial monetary damages as a direct and proximate result of Marino's competitive misconduct, including, without limitation: (i) approximately $2,187,488.00 in lost profits attributable to active jobs diverted away from Plaintiffs to Defendants; (ii) approximately $3,143,768.97 in lost revenue attributable to work-order quotes diverted away from Plaintiffs to Defendants; (iii) loss of recurring service revenue and contracts; (iv) workforce disruption and employee replacement and training costs; and (v) loss of customer goodwill, vendor goodwill, and market share.

56.    Upon information and belief, following Marino's departure, active Plaintiff customer accounts and jobs that Marino had personally managed were diverted to Cavan. These included multiple generator projects, at several job locations, associated with Jacksonville Electric Authority ("JEA") and ACF Industry Energy ("ACF")—each of which functions both as a vendor to and a customer of Plaintiffs. On or about January 27, 2026, ACF

14

cancelled the JEA purchase orders that Marino had managed for Plaintiffs, stating only that the customer "has gone in a different direction," and ACF thereafter sought reimbursement for work left unfinished after Marino and the employees he solicited departed Plaintiffs. Plaintiffs have identified additional active jobs and outstanding work-order quotes diverted to, or pursued by, Cavan following Marino's departure.

57.    Upon information and belief, on one of the diverted JEA jobs, an ASCO Power Technologies automatic transfer switch that had been ordered through ACF for Plaintiffs' benefit was diverted from the intended job site and shipped by freight carrier Averitt to "Santo Marino, 2201 Edison Avenue, Jacksonville, Florida 32204"—Cavan's principal place of business—so that Plaintiffs' equipment was redirected for Cavan's use on the same project. Plaintiffs learned of the diversion when ACF contacted Plaintiffs regarding shipment of a transfer switch for a JEA job that ACF had cancelled.

**F. Misappropriation of Confidential Information and Trade Secrets**

58.    Upon information and belief, in the days, weeks, and months leading up to his October 9, 2025 departure, Marino, in violation of the NDA, the Non-Compete Agreement, the License Agreement, and Florida and federal law, downloaded, copied, transferred, exported, and/or otherwise misappropriated Plaintiffs' Confidential Information, including, without limitation, customer lists, customer email correspondence, vendor information, pricing data, and exported customer relationship management ("CRM") records and customer lists. Specific, dated instances of Marino's misappropriation are set forth in the immediately following paragraphs.

59.    For example, on or about August 6, 2024, Marino forwarded a confidential CJ's accounts-receivable and accounts-payable report (the file "Copy of AR AP 8.6.24.xlsx") from his

15

CJ's email account to an outside personal email address belonging to his wife. The report detailed hundreds of thousands of dollars in Plaintiffs' receivables and payables, itemized by named customer and by named vendor, together with aging and collection information and affiliated Paramount balances. Marino forwarded the report to that outside address approximately fourteen minutes after Plaintiffs' Chief Financial Officer had circulated it internally to Plaintiffs' leadership beneath an express notice that its contents were "strictly confidential" and prohibiting any "dissemination, distribution or copying."

60. Between approximately March and October 2022, Marino repeatedly forwarded Plaintiffs' confidential and proprietary business documents from his CJ's email account to his personal Gmail account and to other personal and family email addresses. These transmissions included active public-bid and solicitation packages, a CJ's estimate template, "Open Bid Schedules" and "Bid Listings" spreadsheets, project schedules, and permit applications. In total, Plaintiffs' records reflect at least sixty-one (61) messages that Marino sent from his CJ's email account to his personal or family email addresses over the course of his employment, a substantial number of which carried Plaintiffs' confidential business attachments.

61. Marino himself regarded and treated Plaintiffs' vendor information as secret and proprietary. On or about April 4, 2025, while still employed by Plaintiffs, Marino sent from his CJ's email account an email attaching a spreadsheet of Plaintiffs' vendor contacts (the file "Vendor Contacts.xlsx") to Brandon Vallario—then a CJ's employee, whom Marino later solicited to leave Plaintiffs and join Cavan—describing the attached vendor list in the body of the email as "My secret list." Marino's own characterization confirms that Plaintiffs' vendor lists and vendor relationships are confidential and are not ascertainable

16

by proper means from public sources. By characterizing Plaintiffs' proprietary vendor list with the possessive "My," Marino asserted personal ownership and dominion over information that belonged to Plaintiffs, reflecting his intent to appropriate and use Plaintiffs' confidential information as his own—for his own benefit and the benefit of a competitor.

62.    Marino also collected, consolidated, and removed Plaintiffs' confidential business information in the form of portable spreadsheets that he maintained in the "My Files" area of his company-provided OneDrive. Chief among these is a master compilation titled "Santo's Folder.xlsx," which consolidated CJ's and Paramount's business into a single file, including a job-status list of active 2025 projects, a receivables and collections tab, and a prior-year (2024) job ledger and a 2025 "Sold Turnkey" ledger together reflecting millions of dollars in sales, itemized by customer. Marino created, copied, and saved "Santo's Folder.xlsx" into his OneDrive on or about August 1, 2025, in preparation for his departure from Plaintiffs.

63.    Marino similarly maintained in his OneDrive additional confidential compilations, including a master project-management workbook containing job-by-job financials, equipment orders, sold-job ledgers, and a customer name-and-address list; a company financial workbook containing accounts-receivable and accounts-payable aging by named customer and vendor; and Plaintiffs' estimating and quoting template exposing Plaintiffs' labor rates, costs, and margin structure. Marino continued to access and work within these company files up to and including October 9, 2025—his final day of employment—on which day he modified a workbook reconciling Plaintiffs' company credit-card spending to specific work orders.

17

64.    Upon information and belief, Marino downloaded, copied, exported, printed, and/or transferred the foregoing compilations to devices, storage, or accounts outside Plaintiffs' control, and retained them after the termination of his employment in violation of his obligation under the NDA and Non-Compete Agreement to return all Confidential Information at or before his departure.

65.    The information Marino removed included Plaintiffs' confidential, non-public vendor pricing, including manufacturer dealer price sheets for Plaintiffs' primary generator vendors and Plaintiffs' internal cost-and-margin structure. This pricing information is not ascertainable by proper means from public sources; it reflects Plaintiffs' negotiated pricing, internal margins, and curated customer and vendor histories developed over many years, and it would give a competitor an unfair advantage in bidding against Plaintiffs. Although isolated data points — such as the identity of a public entity that issued a solicitation — may appear in public records, Plaintiffs' trade secrets consist of the curated, aggregated compilations of that information: their assembled book of business, customer pricing histories and purchasing patterns, vendor selections and negotiated pricing, and internal margins. Those compilations are not readily ascertainable by proper means, and each derives independent economic value from remaining secret.

66.

67.    Marino's self-forwarding of Plaintiffs' confidential documents to his personal and family email accounts, and his consolidation of Plaintiffs' confidential business data into portable compilations, were carried out through Plaintiffs' own systems and were not apparent to Plaintiffs in the ordinary course of business. Plaintiffs did not discover, and could not

18

through the exercise of reasonable diligence have discovered, Marino's misappropriation until it was uncovered through a forensic review of his email and file activity.

68. Upon information and belief, Marino retained Plaintiffs' Confidential Information after the termination of his employment, has used and continues to use that Confidential Information for the benefit of Cavan and Marino and to the detriment of Plaintiffs, and has refused to return or destroy that Confidential Information notwithstanding Plaintiffs' written demands.

69. The Confidential Information misappropriated by Marino constitutes "trade secrets" within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1839(3), and the Florida Uniform Trade Secrets Act, Florida Statutes § 688.001, et seq.

70. Plaintiffs operate their business in interstate commerce, including by selling, servicing, and installing generators for customers throughout the State of Florida and elsewhere in the United States, by sourcing equipment, parts, and components from out-of-state vendors, and by communicating with customers, vendors, and prospective customers across state lines. The trade secrets and Confidential Information misappropriated by Marino are related to, and intended for use in, interstate commerce.

**G. Civil Theft of Hilton Honors Points**

71. During his employment with Plaintiffs, Marino accumulated approximately $4,800.00 in Hilton Honors loyalty points (the "Hilton Points") earned through Plaintiffs' business expenditures and reimbursed travel charged to Plaintiffs' accounts.

72. The Hilton Points were the property of Plaintiffs, having been earned through Plaintiffs' business expenditures and intended for the benefit of Plaintiffs. Plaintiffs, at all times material hereto, had a possessory and ownership interest in the Hilton Points.

19

73.     Notwithstanding Plaintiffs' ownership of the Hilton Points, Marino, with the intent to deprive Plaintiffs of the use and benefit of the Hilton Points, knowingly converted the Hilton Points to his own personal use and benefit, and refused to return the Hilton Points to Plaintiffs upon written demand. Marino further altered account access in a manner designed to prevent Plaintiffs from recovering the Hilton Points and other company property.

74.     When Plaintiffs confronted Marino about his retention of the Hilton Points, Marino was reminded that, as set forth in Plaintiffs' employee handbook, any miles, points, or similar rewards accrued on company funds or to company accounts are the property of the Company, and was asked what could have given him the idea to take company property worth at least $4,800.00. Marino responded, in substance, "well, I didn't think that someone as rich as you seem to be, with all the stuff that you have, would care." Marino's response confirms that he knew the Hilton Points belonged to Plaintiffs and took them notwithstanding that knowledge, and further evidences his felonious intent to permanently deprive Plaintiffs of their property.

**H. Cavan's Knowledge of, and Continued Interference with, the Restrictive Covenants**

75.     On or about February 24, 2026, counsel for Plaintiffs sent a formal written cease-and-desist letter and demand to Cavan, addressed to Marvin Carter at Cavan's principal place of business in Jacksonville, Florida, placing Cavan on actual written notice of (i) the existence and material terms of the Restrictive Covenants; (ii) Marino's binding obligations thereunder through October 9, 2027; (iii) Marino's ongoing breaches; and (iv) Cavan's resulting exposure to claims for tortious interference, injunctive relief, compensatory damages, disgorgement of profits, and attorneys' fees. The letter expressly demanded that

20

Cavan immediately cease and terminate any competitive employment, consulting, qualifying-agent, or licensing relationship with Marino. The letter further demanded that Cavan preserve all communications, agreements, payroll records, licensing filings, and business records relating to Marino, thereby placing Cavan on a litigation hold and on notice of its duty to preserve evidence and to avoid spoliation. A true and correct copy of the February 24, 2026 cease-and-desist letter to Cavan is attached hereto as Exhibit "6" and is incorporated herein by reference.

76.    On or about February 26, 2026, Marino, writing from a Cavan corporate email address (smarino@cavanelectric.com), responded to Plaintiffs' counsel's notice on Cavan's behalf, confirming that Cavan was "represented by counsel" in connection with the dispute and directing all communications to Lee D. Wedekind, III, Esq. of Wedekind LLP. Cavan and its counsel did not deny the existence of the Restrictive Covenants, did not deny Cavan's knowledge of those covenants, and did not deny that Cavan was continuing to employ Marino in violation of those covenants.

77.    After Plaintiffs commenced this action, Cavan released both Brandon Vallario and David Sherman — the two CJ's employees whose hiring had resulted from Marino's unlawful solicitation — while continuing to retain Marino as its qualifying agent. Cavan's decision to shed the solicited employees once litigation began, even as it retained Marino, reflects Cavan's and Edge's knowledge that the solicitation and hiring of those employees violated Plaintiffs' rights.

78.    On or about February 28, 2026, Mr. Wedekind confirmed in writing that Wedekind LLP also represented Marino personally—demonstrating an alignment of legal interests

between Cavan, Edge, and Marino, and the use of common counsel to coordinate Defendants' continued unlawful course of conduct.

## I. Edge's Personal Knowledge and Personal Refusal to Comply

79.    On or about March 3, 2026—notwithstanding Plaintiffs' counsel's prior cease- and-desist letter to Cavan—the Company sent a written letter and email directly to Defendant Aubrey Edge at his personal email address, aedge@dailys.com, expressly addressing Edge in his capacity as the principal owner of Cavan with "ownership position, oversight of, and interest in" Cavan. The letter (the "March 3 Edge Letter") is attached hereto as Exhibit "7" and incorporated herein by reference. The March 3 Edge Letter was transmitted by email on March 5, 2026, with the cease-and-desist correspondence and supporting documentation attached.

80.    The March 3 Edge Letter placed Edge personally on actual written notice of, among other things: (i) the existence and material terms of Marino's binding non-competition and restrictive covenant agreement with CJ's; (ii) Marino's documented and ongoing breaches of those covenants, including by contacting and conducting business with one of CJ's customers, recruiting and hiring an employee from CJ's (Brandon Vallario, who was himself bound by restrictive covenants), and contacting and attempting to solicit business from CJ's vendors; (iii) Marino's misrepresentations to Plaintiffs about his post- departure plans; (iv) the prior cease-and-desist correspondence directed to Marino and to Cavan; and (v) Plaintiffs' express demand that Cavan terminate Marino's employment and terminate the employment of any personnel—including Brandon Vallario—whose hiring resulted from Marino's unlawful solicitation.

81. The March 3 Edge Letter further established, on its face, that Cavan's articulated "only excuse" for the unlawful conduct was a frivolous attack on the authenticity of the executed Non-Compete Agreement—an attack the letter expressly rebutted as "100% unimpeachable."

82. The March 3 Edge Letter set a deadline of March 11, 2026 for Edge to act "professionally" in his ownership capacity to remediate the unlawful conduct.

83. On or about March 10, 2026, the Compnay sent a follow-up email directly to Edge at aedge@dailys.com requesting remediation. On March 11, 2026, Mr. Wedekind, on behalf of Cavan and Marino, responded to the Company and Plaintiffs' counsel—expressly demanding that Plaintiffs cease communicating directly with Cavan's officers, directors, and employees and effectively confirming that Cavan, with Edge's knowledge and authority, would not voluntarily remediate. A true and correct copy of the March 11, 2026 Wedekind email is attached hereto as Exhibit "8" and incorporated herein by reference.

84. Despite his actual personal knowledge of Marino's restrictive covenants, of the documented breaches thereof, and of Plaintiffs' express demands, Edge, in his capacity as Cavan's principal owner and controlling person, intentionally elected, authorized, directed, and ratified Cavan's continued employment of Marino as a qualifying agent, consultant, and/or employee in conscious and willful disregard of Plaintiffs' contractual rights.

85. Edge's personal direction and authorization of Cavan's continued unlawful conduct—after receiving direct, personal, written notice of the Restrictive Covenants and after being personally invited to remediate—was not an act undertaken solely in his corporate capacity, but rather a personal tortious act for which Edge bears individual liability under Florida law. Edge stood to gain personally and directly, as Cavan's principal owner, from the

23

continued unlawful use of Marino's services and from the diversion of Plaintiffs' customers, employees, and vendors to Cavan.

86. Notwithstanding the repeated written notices and demands sent to Cavan and to Edge personally, neither Cavan nor Edge has terminated Cavan's relationship with Marino or otherwise cured the unlawful conduct described herein. Instead, Cavan and Edge have continued to employ, retain, and benefit from Marino's services, have continued to permit Marino to compete unlawfully against Plaintiffs in Florida, and have continued to permit Marino to use Plaintiffs' Confidential Information for Cavan's and Edge's economic benefit.

87. Cavan's and Edge's continued engagement of Marino, with full knowledge of the existence and enforceability of the Restrictive Covenants and of Marino's breaches thereof, is knowing, willful, and malicious, and constitutes intentional and tortious interference with the Restrictive Covenants and with Plaintiffs' contractual and prospective economic relationships.

**J. Pre-Suit Demand and Refusal to Comply**

88. In addition to the February 24, 2026 cease-and-desist letter to Cavan and the March 3 Edge Letter, Plaintiffs' counsel sent a formal written cease-and-desist letter to Marino on February 24, 2026, identifying Marino's breaches in detail and demanding (i) immediate cessation of all competitive activity in Florida; (ii) immediate cessation of contact with Plaintiffs' employees, customers, and vendors; (iii) a sworn affidavit confirming compliance; (iv) a full accounting of all revenues derived from competitive activity; (v) return and destruction of all Confidential Information; (vi) restitution of the Hilton Points; and (vii) preservation of all relevant electronic data and records, which placed Marino on

24

a litigation hold and on notice of his duty to preserve evidence and to avoid spoliation. A true and correct copy of the February 24, 2026 cease-and-desist letter to Marino is attached hereto as Exhibit "5" and is incorporated herein by reference.

89. On or about April 13, 2026, Plaintiffs' counsel sent a formal written settlement demand to Lee D. Wedekind, III, of Wedekind LLP, counsel of record for Defendants, providing Defendants with a final pre-litigation opportunity to resolve this matter. Defendants failed and refused to accept the settlement demand or otherwise to remediate the unlawful conduct described herein.

90. Throughout the pre-suit period, all demand letters, cease-and-desist correspondence, and settlement communications referenced herein were transmitted with Plaintiffs' local Florida counsel, Brett Silverman, Esq., copied or otherwise included as a recipient, ensuring that Defendants and their counsel were on notice of Plaintiffs' coordinated representation by both lead and local counsel.

91. To date, Marino has failed to (i) cease his competitive activity, (ii) return Plaintiffs' Confidential Information, (iii) restore the converted Hilton Points, or (iv) provide the requested affidavits or accountings. To date, Cavan and Edge have failed to terminate or restrict Cavan's relationship with Marino. Defendants' refusal to comply with Plaintiffs' lawful demands necessitates this action.

92. All conditions precedent to the bringing of this action have been satisfied, performed, waived, or excused.

93. Plaintiffs have retained the law firm of DAVID H. HAFT, P.A. and YVLS LAW to represent them in this action and have agreed to pay the firm a reasonable attorneys' fee. Plaintiffs are entitled to recover their reasonable attorneys' fees and costs pursuant to,

among other authorities, Section 10 of the Non-Compete Agreement, 18 U.S.C. § 1836(b)(3)(D), Florida Statutes § 542.335, Florida Statutes § 688.005, and Florida Statutes § 772.11.

## COUNT I

### VIOLATION OF THE DEFEND TRADE SECRETS ACT OF 2016

### (18 U.S.C. § 1836, et seq.)

### (Against Defendants Marino, Cavan, and Edge)

94. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

95. Plaintiffs own valuable trade secrets, consisting of the specific compilations and confidential materials identified above — including Plaintiffs' consolidated customer and job ledgers, customer pricing histories and purchasing patterns, vendor lists and confidential dealer pricing, internal cost-and-margin structures, active bid and estimate files, and company accounts-receivable and accounts-payable financial reports (collectively, the "Trade Secrets"). The Trade Secrets consist of curated, non-public information that Plaintiffs developed and compiled over many years and that is not readily ascertainable by proper means.

96. The Trade Secrets constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3) in that (i) Plaintiffs have taken reasonable measures to keep such information secret, including by limiting disclosure on a need-to-know basis, by maintaining the information on password-protected systems, and by requiring employees and consultants to execute confidentiality agreements such as the NDA and the Non-Compete Agreement; and (ii) the

26

Trade Secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

97. The Trade Secrets are related to products and services used in, or intended for use in, interstate commerce. Plaintiffs sell, install, and service generators for customers throughout Florida and elsewhere, source goods from out-of-state suppliers, and conduct business communications across state lines.

98. Defendants have misappropriated Plaintiffs' Trade Secrets within the meaning of 18 U.S.C. § 1839(5) in that Defendants have acquired, disclosed, and/or used Plaintiffs' Trade Secrets without Plaintiffs' express or implied consent and through improper means, including, without limitation, breach of an express duty to maintain secrecy and breach of an express duty to limit use. Specifically:

99. (a) Marino acquired Plaintiffs' Trade Secrets in the course of his employment under express written confidentiality obligations contained in the NDA and the Non-Compete Agreement, then knowingly downloaded, copied, transferred, exported, and/or retained those Trade Secrets in violation of those obligations and used them, and continues to use them, for the benefit of himself, Cavan, and Edge, and to the detriment of Plaintiffs;

(b) Cavan acquired Plaintiffs' Trade Secrets through Marino with knowledge, or reason to know, that Marino had acquired the Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and a duty to limit their use, and Cavan used and continues to use those Trade Secrets in its business operations in direct competition with Plaintiffs; and

(c) Edge, after receiving direct, personal, written notice of Marino's confidentiality obligations and of Marino's misappropriation, knowingly authorized, directed, and ratified

27

Cavan's continued acquisition and use of Plaintiffs' Trade Secrets through Marino, with full knowledge or reason to know that the Trade Secrets had been acquired through improper means.

100. Marino's misappropriation was carried out through specific, dated acts, including: forwarding Plaintiffs' confidential accounts-receivable and accounts-payable reports and other confidential business compilations from his CJ's email account to personal and family email accounts; transmitting Plaintiffs' confidential vendor list to a CJ's employee, describing it as his "secret list"; and consolidating Plaintiffs' customer, vendor, pricing, and financial data into portable spreadsheets that he saved to his the "My Files" area of his company-provided OneDrive in preparation for his departure and thereafter downloaded, copied, exported, and/or transferred those compilations to devices, storage, or accounts and retained and used them for his own benefit and for the benefit of Cavan.

101. Defendants' misappropriation of Plaintiffs' Trade Secrets is willful, malicious, knowing, and in bad faith.

102. As a direct and proximate result of Defendants' misappropriation of Plaintiffs' Trade Secrets, Plaintiffs have suffered and continue to suffer substantial monetary damages, including, without limitation, lost profits exceeding $2,187,488.00 from active jobs diverted to Defendants and lost revenue exceeding $3,143,768.97 from work-order quotes diverted to Defendants, in addition to ongoing and irreparable harm to Plaintiffs' goodwill, customer relationships, vendor relationships, workforce, and competitive position.

103. Defendants have also been unjustly enriched by their misappropriation of Plaintiffs' Trade Secrets, in an amount to be proven at trial.

28

104. Pursuant to 18 U.S.C. § 1836(b)(3), Plaintiffs are entitled to recover (i) damages for actual loss caused by the misappropriation; (ii) damages for any unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss; (iii) in lieu of (i) and (ii), a reasonable royalty for Defendants' unauthorized disclosure or use of the Trade Secrets; (iv) exemplary damages of up to two times the amount of damages awarded in an amount to be determined at trial, by reason of Defendants' willful and malicious misappropriation; and (v) reasonable attorneys' fees and costs.

105. Plaintiffs are further entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A), enjoining Defendants from any actual or threatened further misappropriation of the Trade Secrets, requiring Defendants to deliver up and destroy any items containing or embodying the Trade Secrets, and requiring such other affirmative acts as are necessary to protect the Trade Secrets.

106. Plaintiffs have no adequate remedy at law and will suffer immediate and irreparable harm in the absence of injunctive relief.

## COUNT II

## INJUNCTIVE RELIEF UNDER THE DEFEND TRADE SECRETS ACT

## (18 U.S.C. § 1836(b)(3)(A))

## (Against All Defendants)

107. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

108. Plaintiffs operate their business in interstate commerce in Florida and elsewhere, and the Trade Secrets misappropriated by Defendants are related to and intended for use in interstate commerce.

109. As alleged above, Defendants have misappropriated, and continue to threaten to misappropriate, Plaintiffs' Trade Secrets within the meaning of the DTSA.

110. Plaintiffs have taken and continue to take reasonable measures to maintain the secrecy of the Trade Secrets. The Trade Secrets derive independent economic value from not being generally known to, or readily ascertainable by, persons (such as Defendants) who could obtain economic value from their disclosure or use.

111. Defendants' continued possession and use of the Trade Secrets has caused, and will continue to cause, Plaintiffs to suffer immediate, ongoing, and irreparable harm, including, without limitation, the loss of customers, the loss of customer goodwill, and the dilution and continued exposure of the Trade Secrets themselves.

112. Plaintiffs' irreparable harm cannot be adequately remedied by an award of money damages alone.

113. Defendants will not suffer any cognizable harm from the entry of an injunction prohibiting them from misappropriating Plaintiffs' Trade Secrets and requiring the return and destruction of the Trade Secrets, as Defendants have no lawful right to use Plaintiffs' Trade Secrets, and Defendants remain free to conduct their business through lawful means.

114. The public interest will be served by the issuance of injunctive relief because the public has a strong interest in the enforcement of contractual confidentiality obligations and in the protection of trade secrets.

115.    Accordingly, Plaintiffs are entitled to a preliminary and permanent injunction pursuant to 18 U.S.C. § 1836(b)(3)(A) (i) enjoining Defendants and all persons acting in concert with them from any further misappropriation, use, or disclosure of the Trade Secrets; (ii) requiring Defendants to deliver up to Plaintiffs all items containing or embodying the Trade Secrets and to permanently destroy all copies thereof; (iii) requiring Defendants to submit their computers, electronic storage devices, mobile devices, cloud-storage accounts, email accounts, and other relevant electronic systems to forensic examination at Defendants' expense; and (iv) requiring such other affirmative acts as are necessary to protect the Trade Secrets.

## COUNT III

## MISAPPROPRIATION OF TRADE SECRETS UNDER THE FLORIDA UNIFORM TRADE SECRETS ACT
### (Florida Statutes § 688.001, et seq.)
### (Against All Defendants)

116.    Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

117.    The Confidential Information described herein — consisting of the specific compilations and confidential materials identified above, including Plaintiffs' consolidated customer and job ledgers, customer pricing histories and purchasing patterns, vendor lists and confidential dealer pricing, internal cost-and-margin structures, active bid and estimate files, and company accounts-receivable and accounts-payable reports — constitutes "trade secrets" within the meaning of Florida Statutes § 688.002(4).

31

118. Plaintiffs have taken reasonable efforts under the circumstances to maintain the secrecy of their trade secrets, including, without limitation, by requiring employees with access to such information to execute written confidentiality and non-disclosure agreements such as the NDA and the Non-Compete Agreement, by limiting access on a need-to-know basis, and by maintaining the information on password-protected systems.

119. Plaintiffs' trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from their disclosure or use.

120. Defendants have misappropriated Plaintiffs' trade secrets within the meaning of Florida Statutes § 688.002(2) by acquiring, using, and/or disclosing Plaintiffs' trade secrets through improper means, including, without limitation, breach of express duties to maintain secrecy and to limit use, and with knowledge or reason to know that the trade secrets had been acquired by improper means. Edge in particular, after personally receiving the March 3 Edge Letter, knowingly directed, authorized, and ratified Cavan's continued use of Plaintiffs' trade secrets through Marino.

121. Marino's misappropriation included forwarding Plaintiffs' confidential financial reports and business compilations from his CJ's email account to his personal and family email accounts, and consolidating and porting Plaintiffs' customer, vendor, pricing, and financial data into portable spreadsheets in the "My Files" area of his company OneDrive account in preparation for his departure. Upon information and belief, Marino downloaded, copied, exported, and/or transferred those compilations to devices, storage, or accounts outside Plaintiffs' control. That Marino had earlier described Plaintiffs' vendor list as his own

32

"secret list" further confirms both the confidentiality of Plaintiffs' information and his intent to appropriate and use it as his own.

122. Defendants' misappropriation has been and continues to be willful and malicious within the meaning of Florida Statutes § 688.004(2).

123. As a direct and proximate result of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs have suffered and continue to suffer actual damages, and Defendants have been unjustly enriched, in amounts to be proven at trial.

124. Pursuant to Florida Statutes § 688.003, Plaintiffs are entitled to a preliminary and permanent injunction enjoining further actual or threatened misappropriation.

125. Pursuant to Florida Statutes § 688.004, Plaintiffs are entitled to recover (i) damages for actual loss; (ii) damages for unjust enrichment not taken into account in computing actual loss; and (iii) by reason of Defendants' willful and malicious misappropriation, exemplary damages in an amount up to twice the compensatory damages.

126. Pursuant to Florida Statutes § 688.005, Plaintiffs are entitled to recover their reasonable attorneys' fees by reason of Defendants' willful and malicious misappropriation.

## COUNT IV

### BREACH OF CONTRACT—NON-COMPETE AGREEMENT

### (Florida Statutes § 542.335)

### (Against Defendant Marino)

127. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

33

128. The Non-Compete Agreement is a valid, enforceable, and binding contract between Plaintiffs and Marino. Marino voluntarily entered into the Non-Compete Agreement in writing, in consideration for his employment with Plaintiffs.

129. The Non-Compete Agreement protects Plaintiffs' legitimate business interests within the meaning of Florida Statutes § 542.335(1)(b), including, without limitation, (i) substantial relationships with specific prospective and existing customers; (ii) valuable confidential business information and trade secrets; (iii) customer goodwill associated with Plaintiffs' ongoing business and Plaintiffs' specific geographic locations and trade areas; and (iv) extraordinary or specialized training.

130. The two-year temporal scope of the restrictive covenants is reasonably necessary to protect Plaintiffs' legitimate business interests and is presumptively reasonable under Florida Statutes § 542.335(1)(d)1.

131. The geographic scope of the Non-Compete Agreement—the State of Florida—is reasonably necessary to protect Plaintiffs' legitimate business interests in light of the geographic scope of Plaintiffs' operations.

132. On October 6, 2025, Marino expressly reaffirmed and ratified the Non-Compete Agreement by executing the License Agreement, Section 6 of which acknowledges the existence of the Non-Compete Agreement and confirms that the obligations thereunder "remain in full force and effect."

133. Plaintiffs have at all times performed their obligations under the Non-Compete Agreement, or any non-performance has been waived or excused.

134. Marino has materially breached the Non-Compete Agreement by, among other things: (i) accepting employment, consulting, qualifying-agent, and/or licensing relationships with

34

Cavan, a competitor of Plaintiffs operating in Florida, in violation of Section 5; (ii) registering his Florida electrical contractor license to qualify Cavan to perform competitive work in Florida, in violation of Section 5; (iii) soliciting and accepting business from Plaintiffs' customers, in violation of Section 4; (iv) soliciting and recruiting Plaintiffs' employees, including Brandon Vallario and David Sherman, in violation of Section 4; (v) interfering with Plaintiffs' vendor relationships, in violation of Section 4; (vi) misappropriating, retaining, and using Plaintiffs' Confidential Information, in violation of Section 3; and (vii) failing to return all tangible evidence of Confidential Information at or prior to the termination of his employment, in violation of Section 3.

135.    Pursuant to Section 6 of the Non-Compete Agreement, the time restrictions applicable to Sections 4 and 5 are tolled during any period of breach by Marino. Accordingly, the restrictive period extends day-for-day for each day of Marino's continuing breach.

136.    Pursuant to Florida Statutes § 542.335(1)(j), violation of an enforceable restrictive covenant creates a presumption of irreparable injury to Plaintiffs.

137.    Pursuant to Section 7 of the Non-Compete Agreement, Marino expressly acknowledged that any breach or threatened breach would cause irreparable harm to Plaintiffs for which the remedies at law would be inadequate, and that Plaintiffs would be entitled to injunctive relief without notice and without bond.

138.    As a direct and proximate result of Marino's breaches, Plaintiffs have suffered and continue to suffer substantial monetary damages, including, without limitation, lost profits exceeding $2,187,488.00 from active jobs diverted to Defendants, lost revenue exceeding $3,143,768.97 from work- order quotes diverted to Defendants, loss of recurring service

35

revenue, workforce disruption, and loss of customer goodwill, in amounts to be proven at trial.

139. Pursuant to Section 10 of the Non-Compete Agreement and Florida Statutes § 542.335(1)(k), Plaintiffs are entitled, as the prevailing parties, to recover their reasonable attorneys' fees and costs, including pre-suit, investigative, and appellate fees and costs.

## COUNT V

## BREACH OF CONTRACT—NON-DISCLOSURE AGREEMENT

### (Against Defendant Marino)

140. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

141. The NDA is a valid, enforceable, and binding contract between Plaintiffs (and their related and affiliated entities, as third-party beneficiaries) and Marino. Marino voluntarily entered into the NDA in writing on or about January 31, 2022.

142. Plaintiffs have at all times performed their obligations under the NDA, or any non-performance has been waived or excused.

143. Marino has materially breached the NDA by, among other things: (i) failing to maintain in confidence Plaintiffs' Confidential Information; (ii) using Plaintiffs' Confidential Information for purposes other than Plaintiffs' legitimate business, namely, to compete with Plaintiffs through Cavan; (iii) disclosing Plaintiffs' Confidential Information to third parties, including Cavan and Edge and, on or about April 4, 2025, a CJ's employee to whom Marino sent Plaintiffs' confidential vendor list described as his "secret list", without Plaintiffs' prior written consent; (iv) failing to promptly notify Plaintiffs of breaches of

36

confidentiality; (v) circumventing Plaintiffs in business dealings; and (vi) hiring or attempting to hire Plaintiffs' staff in violation of Section 2.7 of the NDA.

144. As a direct and proximate result of Marino's breaches of the NDA, Plaintiffs have suffered and continue to suffer substantial monetary damages and irreparable harm in amounts to be proven at trial.

145. Pursuant to Section 7.7 of the NDA, Marino acknowledged that the remedies at law may be inadequate to protect Plaintiffs against breach, agreed not to oppose injunctive relief on the ground of failure to prove actual damage, and acknowledged Plaintiffs' right to injunctive relief.

## COUNT VI

## BREACH OF CONTRACT—LICENSE UTILIZATION AND CONSULTING AGREEMENT

### (Against Defendant Marino)

146. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

147. The License Agreement is a valid, enforceable, and binding contract between Plaintiffs and Marino, executed by Marino on or about October 6, 2025. Marino received compensation for executing this agreement.

148. Plaintiffs have at all times performed their obligations under the License Agreement, or any non-performance has been waived or excused.

37

149. Section 6 of the License Agreement expressly reaffirms and ratifies Marino's pre-existing non-compete and non-solicitation obligations under the Non-Compete Agreement and confirms that those obligations "remain in full force and effect."

150. Marino has materially breached the License Agreement by, among other things, engaging in the conduct described in Counts IV and V above, including by competing with Plaintiffs in Florida, soliciting Plaintiffs' customers, and soliciting Plaintiffs' employees during the period in which Section 6 of the License Agreement and the underlying Non-Compete Agreement remain in full force and effect.

151. As a direct and proximate result of Marino's breaches of the License Agreement, Plaintiffs have suffered and continue to suffer substantial monetary damages and irreparable harm in amounts to be proven at trial. 134.

## COUNT VII

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

### (Against Defendants Cavan and Edge)

152. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

153. The NDA, the Non-Compete Agreement, and the License Agreement are valid and enforceable contracts between Plaintiffs and Marino.

154. Cavan had actual knowledge of the Restrictive Covenants and the License Agreement no later than February 24, 2026, when Plaintiffs' counsel sent Cavan a formal written cease-and-desist letter and notice of tortious interference.

155. Edge had actual personal knowledge of the Restrictive Covenants and the License Agreement no later than March 3, 2026 (transmitted by email on March 5, 2026), when the Company sent the March 3 Edge Letter directly to Edge at his personal email address, expressly addressing Edge in his capacity as the principal owner of Cavan, and attaching the prior cease-and-desist correspondence and supporting documentation.

156. Edge's personal knowledge of the Restrictive Covenants is further established by, among other things, his receipt of the cease-and-desist letter on Cavan's behalf, his receipt of the March 3 Edge Letter, his receipt of the cease-and-desist letter previously sent to Brandon Vallario (which was attached to the March 3 Edge Letter), and his actual knowledge of Marino's continued employment with Cavan in a competitive capacity.

157. Notwithstanding their actual knowledge of the Restrictive Covenants and Plaintiffs' express demands, Cavan and Edge intentionally and without justification procured, induced, and/or facilitated Marino's continued breaches of the Restrictive Covenants by, among other things: (i) continuing to employ, consult with, and/or contract with Marino as a qualifying agent and otherwise; (ii) continuing to use Marino's qualifying-agent license to perform generator- related electrical contracting work in Florida in direct competition with Plaintiffs; and (iii) accepting and benefitting from work performed by Marino in violation of the Restrictive Covenants.

158. Edge personally directed, authorized, and ratified Cavan's tortious conduct in his capacity as Cavan's principal owner and controlling person. Edge's personal participation in Cavan's tortious conduct exceeded the scope of any privilege incident to his ownership and corporate role: Edge acted with personal knowledge that Marino was bound by enforceable Restrictive Covenants, with personal knowledge of the resulting harm to Plaintiffs, and

39

with the personal expectation of deriving personal economic benefit from the unlawful conduct as Cavan's principal owner.

159. Defendants Cavan's and Edge's interference is and has been intentional, willful, malicious, and without justification or excuse. Defendants' continued engagement of Marino following written notice of the Restrictive Covenants constitutes knowing and conscious disregard of Plaintiffs' contractual rights.

160. As a direct and proximate result of Cavan's and Edge's intentional interference, Marino has continued to breach the Restrictive Covenants and the License Agreement, and Plaintiffs have suffered and continue to suffer substantial monetary damages and irreparable harm, including, without limitation, lost profits exceeding $2,187,488.00, lost revenue exceeding $3,143,768.97, loss of customers, loss of employees, loss of vendor relationships, loss of goodwill, and loss of competitive advantage, in amounts to be proven at trial.

161. Defendants' interference was intentional, willful, and malicious. Marino used Plaintiffs' confidential information to divert Plaintiffs' customers and to solicit Plaintiffs' employees for a direct competitor while bound by his covenants; and Cavan and Edge continued to employ and benefit from Marino, and from the diversion of Plaintiffs' customers, vendors, and employees, after receiving detailed written notice of Marino's restrictive covenants — including the March 3 Edge Letter to Edge personally — and after Edge personally declined to remediate. Once Plaintiffs filed suit, Cavan released the two employees whose hiring had resulted from Marino's unlawful solicitation while retaining Marino himself. By reason of that knowing, post-notice conduct, Plaintiffs are entitled to recover punitive damages pursuant to Florida Statutes § 768.72.

40

## COUNT VIII

## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS

## RELATIONSHIPS

### (Against All Defendants)

162. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

163. Plaintiffs have established and maintain advantageous business relationships with their existing and prospective customers, vendors, and employees, from which Plaintiffs derive substantial economic benefit and reasonably expect to continue deriving substantial economic benefit.

164. Defendants knew, or should have known, of Plaintiffs' advantageous business relationships, and Defendants intended to interfere, and have intentionally interfered, with those relationships.

165. Defendants have intentionally and without justification interfered with Plaintiffs' advantageous business relationships by, among other things: (i) soliciting Plaintiffs' customers, including customers with whom Marino had developed substantial relationships during his employment with Plaintiffs; (ii) diverting business from Plaintiffs to Cavan, including approximately $2,187,488.00 in active jobs and approximately $3,143,768.97 in work-order quotes; (iii) soliciting and recruiting Plaintiffs' employees, including Brandon Vallario and David Sherman; and (iv) interfering with Plaintiffs' vendor relationships.

166. Edge personally and intentionally interfered with Plaintiffs' advantageous business relationships by, after receiving direct, personal, written notice on or about March 3, 2026

of Marino's restrictive covenants and of the resulting harm to Plaintiffs, expressly authorizing, directing, and ratifying Cavan's continued employment of Marino and Cavan's continued use of Marino's qualifying-agent license to compete in the Florida marketplace. Edge's conduct was undertaken with personal knowledge that the conduct would damage Plaintiffs' advantageous business relationships and with personal expectation of derivative economic gain.

167. Defendants used improper means to interfere with Plaintiffs' relationships, including, without limitation, the misappropriation and use of Plaintiffs' Confidential Information and Trade Secrets, breach of binding restrictive covenants, and the making of false representations to customers and vendors.

168. As a direct and proximate result of Defendants' tortious interference, Plaintiffs have suffered and continue to suffer substantial monetary damages and irreparable harm in amounts to be proven at trial.

169. Defendants' interference was intentional, willful, and malicious. Marino used Plaintiffs' confidential information to divert Plaintiffs' customers and to solicit Plaintiffs' employees for a direct competitor while bound by his covenants; and Cavan and Edge continued to employ and benefit from Marino, and from the diversion of Plaintiffs' customers, vendors, and employees, after receiving detailed written notice of Marino's restrictive covenants — including the March 3 Edge Letter to Edge personally — and after Edge personally declined to remediate. Once Plaintiffs filed suit, Cavan released the two employees whose hiring had resulted from Marino's unlawful solicitation while retaining Marino himself. By reason of that knowing, post-notice conduct, Plaintiffs are entitled to recover punitive damages pursuant to Florida Statutes § 768.72.

42

## COUNT IX

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AND

## BREACH OF CONTRACT

### (Against Defendants Cavan and Edge)

170. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

171. Marino owed Plaintiffs duties of loyalty and confidentiality arising out of his position of trust and confidence as an employee of Plaintiffs and arising out of the express written terms of the NDA, the Non-Compete Agreement, and the License Agreement.

172. Marino has materially breached those duties by, among other things, the conduct described in Counts IV through VI and Count XII below.

173. Cavan and Edge had actual knowledge of Marino's duties to Plaintiffs and of Marino's breaches of those duties, including by virtue of (i) Plaintiffs' counsel's February 24, 2026 cease-and-desist letter to Cavan; (ii) the Company's March 3 Edge Letter directly to Edge; (iii) the cease-and-desist letter to Brandon Vallario, which was attached to the March 3 Edge Letter and which independently confirmed the existence of similar restrictive covenants applicable to former CJ's employees; and (iv) the alignment of legal interests confirmed by Wedekind LLP's joint representation of Cavan and Marino.

174. Cavan and Edge knowingly and substantially assisted Marino's breaches of duty by, among other things, employing Marino in a competitive capacity, using Marino's qualifying-agent license to perform competitive work in Florida, paying Marino for his services, providing Marino with the resources and platform to compete against Plaintiffs, and continuing to

43

retain Marino notwithstanding repeated written demands that the relationship be terminated.

175. As a direct and proximate result of Cavan's and Edge's knowing and substantial assistance, Marino has continued to breach his duties to Plaintiffs and Plaintiffs have suffered and continue to suffer substantial monetary damages and irreparable harm in amounts to be proven at trial.

## COUNT X

## CIVIL THEFT

## (Florida Statutes §§ 772.11 and 812.014)

## (Against Defendant Marino)

176. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

177. Plaintiffs were and are the lawful owners of (i) the Hilton Points, valued at approximately $4,800.00; and (ii) the Confidential Information and Trade Secrets described herein.

178. Marino, with the felonious intent to deprive Plaintiffs of their rights to and benefits from the Hilton Points and the Confidential Information, knowingly obtained or used, or endeavored to obtain or use, the Hilton Points and the Confidential Information for his own personal use and benefit, in violation of Florida Statutes § 812.014.

179. Marino's conduct constitutes "theft" as defined in Florida Statutes § 812.014(1) in that Marino knowingly obtained, used, or endeavored to obtain or use Plaintiffs' property with intent to (a) deprive Plaintiffs of a right to or a benefit from the property, and/or (b)

44

appropriate the property to his own use or to the use of any person not entitled to the use of the property.

180. Marino's altering of account access in a manner designed to prevent Plaintiffs from recovering the Hilton Points and other company property constitutes additional evidence of Marino's felonious intent.

181. On or about February 24, 2026, Plaintiffs' counsel served upon Marino a written demand for restitution of the Hilton Points pursuant to Florida Statutes § 772.11(1). Marino has failed and refused to make restitution, and more than thirty (30) days have elapsed since service of the demand.

182. Pursuant to Florida Statutes § 772.11(1), Plaintiffs are entitled to recover (i) treble damages, in the amount of approximately $14,400.00 with respect to the Hilton Points, plus treble damages on the value of any Confidential Information and Trade Secrets converted by Marino in amounts to be proven at trial; (ii) reasonable attorneys' fees; and (iii) court costs.

## COUNT XI

## CONVERSION

### (Against Defendant Marino)

183. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

184. Plaintiffs were and are the lawful owners of, and at all material times have had a superior possessory and ownership interest in, the Hilton Points, the Confidential Information, and

45

any other tangible or intangible company property obtained by Marino during the course of his employment.

185. Marino has, without authorization or consent, exercised dominion and control over Plaintiffs' property in a manner inconsistent with Plaintiffs' rights, including by retaining the Hilton Points, retaining and using the Confidential Information for his own benefit and the benefit of Cavan, and by diverting Plaintiffs' equipment, including an ASCO automatic transfer switch ordered through ACF for a Plaintiff customer job, to an address associated with Cavan, and altering account access to prevent Plaintiffs from recovering company property.

186. Plaintiffs have made written demand upon Marino for the return of Plaintiffs' property. Marino has refused to return Plaintiffs' property.

187. As a direct and proximate result of Marino's conversion, Plaintiffs have suffered and continue to suffer monetary damages in amounts to be proven at trial.

## COUNT XII

### BREACH OF DUTY OF LOYALTY

**(Against Defendant Marino)**

188. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

189. During the course of his employment with Plaintiffs, Marino occupied a position of trust and confidence and owed Plaintiffs a duty of loyalty under Florida law.

190. Marino breached his duty of loyalty by, among other things, while still employed by Plaintiffs and/or while still a contracting party under the License Agreement: (i)

46

misappropriating, downloading, copying, and exporting Plaintiffs' Confidential Information for his own personal use and the use of Cavan; (ii) preparing to compete with Plaintiffs through Cavan while continuing to receive compensation from Plaintiffs; (iii) misrepresenting his post-departure plans to Plaintiffs; and (iv) acting in a manner inconsistent with Plaintiffs' interests; and (v) compiling, consolidating, and porting Plaintiffs' confidential business compilations to his personal email accounts and personal cloud storage for no legitimate business purpose related to his role as a project manager.

191. As a direct and proximate result of Marino's breach of the duty of loyalty, Plaintiffs have suffered and continue to suffer monetary damages in amounts to be proven at trial.

## COUNT XIII

### UNJUST ENRICHMENT

### (Against Defendant Marino—Pleaded in the Alternative)

192. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1, 2, and 5 through 27, paragraph 40, and paragraphs 42 through 88 of this Complaint as if fully set forth herein. Plaintiffs expressly do NOT incorporate paragraphs 3 and 4, paragraphs 28 through 39, or paragraph 41, all of which concern the existence and terms of the written agreements between Plaintiffs and Defendant Marino. Plaintiffs further do not incorporate any allegation contained in any preceding Count of this Complaint.

193. This Count is pleaded in the alternative to Counts IV, V, and VI (Plaintiffs' breach-of-contract claims against Marino) pursuant to Federal Rule of Civil Procedure 8(d)(2). To the extent any of the written agreements referenced elsewhere in this Complaint is determined to be unenforceable, void, voidable, rescinded, or otherwise inapplicable to the

conduct described herein, Plaintiffs are entitled to recover in equity under the doctrine of unjust enrichment.

194.   Independent of any written agreement between the parties, Plaintiffs conferred substantial benefits upon Defendant Marino, including, without limitation: (i) specialized training in Plaintiffs' business operations and methods; (ii) access to and the use of Plaintiffs' substantial customer relationships, customer goodwill, and customer trust developed over many years; (iii) access to and the use of Plaintiffs' vendor relationships and exclusive vendor arrangements; (iv) access to and the use of Plaintiffs' confidential business information, including pricing data, customer pricing histories, vendor pricing arrangements, and customer relationship management records; (v) the use of Plaintiffs' business credit and the accumulation of approximately $4,800.00 in Hilton Honors loyalty points earned through Plaintiffs' business expenditures; and (vi) the platform, infrastructure, and goodwill of Plaintiffs' ongoing business by which Marino was able to develop substantial customer and vendor relationships.

195.   Defendant Marino had knowledge of, and voluntarily accepted, the foregoing benefits.

196.   Defendant Marino has retained the foregoing benefits, including by continuing to use Plaintiffs' customer relationships, vendor relationships, confidential business information, and goodwill for his own personal economic benefit and for the benefit of Defendant Cavan, and by retaining the converted Hilton Honors points.

197.   Under the circumstances described herein, it would be inequitable for Defendant Marino to retain the benefits conferred upon him by Plaintiffs without payment to Plaintiffs of the reasonable value thereof, including, without limitation, all revenues, profits, and other

48

economic gains derived by Marino from his unauthorized use of Plaintiffs' customer relationships, vendor relationships, confidential business information, and goodwill.

198. As a direct and proximate result of Marino's unjust enrichment, Plaintiffs are entitled to recover the value of the benefits unjustly retained by Marino and to disgorgement of all revenues, profits, and other economic gains derived therefrom, in an amount to be proven at trial.

## COUNT XIII-A

### UNJUST ENRICHMENT

**(Against Defendants Cavan Electric, Inc. and Aubrey Edge)**

199. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 88 of this Complaint (the General Allegations) as if fully set forth herein. Plaintiffs do not incorporate any allegation contained in any preceding Count of this Complaint.

200. There is no written contract between Plaintiffs and Defendants Cavan or Edge governing the subject matter of this Count.

201. Plaintiffs have conferred substantial benefits upon Defendants Cavan and Edge, including, without limitation: (i) the value of Plaintiffs' customer relationships and goodwill, which Cavan and Edge have used and exploited through Marino to divert active jobs and work-order quotes from Plaintiffs to Cavan, including approximately $2,187,488.00 in diverted active jobs and approximately $3,143,768.97 in diverted work-order quotes; (ii) the value of Plaintiffs' vendor relationships, which Cavan and Edge have used and exploited through Marino; (iii) the value of Plaintiffs' specialized training and experience invested in Marino, which Cavan and Edge have appropriated by employing, consulting with, and benefiting from Marino's services; (iv) the value of Plaintiffs' specialized training and experience

49

invested in Brandon Vallario, whose hiring resulted from Marino's unlawful solicitation and whose employment by Cavan benefited Cavan and Edge; and (v) the value of Plaintiffs' confidential business information, including customer lists, vendor lists, pricing data, and customer relationship management records, which Cavan and Edge have used and exploited through Marino in their competitive operations.

202.    Defendants Cavan and Edge had knowledge of, and voluntarily accepted, the foregoing benefits. Cavan had actual written knowledge no later than February 24, 2026 (the date of Plaintiffs' counsel's cease-and-desist letter to Cavan), and Edge had actual personal written knowledge no later than March 5, 2026 (the date the March 3 Edge Letter was transmitted to Edge by email). Notwithstanding such knowledge, both Cavan and Edge voluntarily continued to accept and benefit from the services of Marino and the diversion of Plaintiffs' customers, vendors, employees, and confidential information.

203.    Defendants Cavan and Edge have retained the foregoing benefits, including, without limitation, by retaining the revenues and profits earned from diverted customers and projects, and by continuing to employ Marino in a competitive capacity utilizing Plaintiffs' trained expertise and customer relationships. Edge, as the principal owner and controlling person of Cavan, derives direct personal economic benefit from Cavan's retention of these benefits.

204.    Under the circumstances described herein, it would be inequitable for Defendants Cavan and Edge to retain the benefits conferred upon them by Plaintiffs without payment to Plaintiffs of the reasonable value thereof, including, without limitation, all revenues, profits, and other economic gains derived by Cavan and Edge from the unauthorized use

of Plaintiffs' customer relationships, vendor relationships, employee relationships, confidential business information, specialized training, and goodwill.

205.    As a direct and proximate result of Cavan's and Edge's unjust enrichment, Plaintiffs are entitled to recover the value of the benefits unjustly retained by Cavan and Edge and to disgorgement of all revenues, profits, and other economic gains derived therefrom, jointly and severally, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs CJ's Power Systems, Inc. and Paramount Power, Inc. respectfully request that this Court enter judgment against Defendants Santo Marino, Jr., Cavan Electric, Inc., and Aubrey Edge, jointly and severally where appropriate, granting the following relief:

(a) On Counts I, II, III, IV, V, VI, VII, VIII, IX, XIII, and XIII-A, awarding compensatory damages, jointly and severally as to all Defendants other than Counts IV through VI and X through XII (which are asserted against Marino only), in an amount to be proven at trial but not less than $5,331,256.97, plus pre-judgment and post-judgment interest at the maximum rate permitted by law;

(b) On Counts I and III, awarding exemplary damages, jointly and severally, of up to two (2) times the amount of compensatory damages by reason of Defendants' willful and malicious misappropriation, pursuant to 18 U.S.C. § 1836(b)(3)(C) and Florida Statutes § 688.004(2);

(c) On Count X, awarding treble damages against Marino, including approximately $14,400.00 attributable to the Hilton Points and treble damages on the value of all converted Confidential Information, pursuant to Florida Statutes § 772.11(1);

(d) On Count VII, awarding punitive damages against Cavan and Edge, and on Count VIII, awarding punitive damages against all Defendants, jointly and severally, in an amount sufficient to punish Defendants and deter similar conduct, pursuant to Florida Statutes § 768.72;

(e) On Counts XIII and XIII-A, ordering Defendants to disgorge all revenues, profits, and other benefits derived from the unlawful conduct alleged herein;

(f) Issuing a temporary restraining order, preliminary injunction, and permanent injunction, pursuant to 18 U.S.C. § 1836(b)(3)(A), Florida Statutes §§ 542.335 and 688.003, and the Court's general equitable powers, enjoining Defendants and all persons acting in active concert or participation with them from: (i) any further use, disclosure, or dissemination of Plaintiffs' Confidential Information and Trade Secrets; (ii) any further competition by Marino with Plaintiffs in the State of Florida; (iii) any further solicitation or servicing of Plaintiffs' customers, prospective customers, vendors, or employees; (iv) any continued employment, consulting, qualifying-agent, or licensing relationship between Marino and Cavan to the extent it places Marino in competition with Plaintiffs; (v) employing, re-employing, re-engaging, or otherwise retaining Brandon Vallario or David Sherman by Cavan, in violation of the applicable restrictive covenants; and (vi) any further interference with Plaintiffs' contracts and advantageous business relationships;

(g) Ordering Defendants to immediately deliver up to Plaintiffs all originals and copies of Plaintiffs' Confidential Information and Trade Secrets in their possession, custody, or control, and to destroy any remaining copies, and to provide a sworn affidavit confirming compliance;

(h) Ordering Defendants to submit all of their computers, electronic storage devices, mobile telephones, cloud-storage accounts, email accounts, servers, and other electronic systems to forensic examination by a neutral expert, at Defendants' expense, to confirm the return and destruction of Plaintiffs' Confidential Information and Trade Secrets;

52

(i) Ordering Defendants Cavan and Edge to terminate or restructure Cavan's relationship with Marino so that Marino is no longer engaged in any capacity that competes with Plaintiffs;

(j) Ordering tolling and extension of the restrictive period under the Non-Compete Agreement on a day-for-day basis for each day of Marino's continuing breach pursuant to Section 6 of the Non-Compete Agreement;

(k) Ordering an accounting by Defendants of all jobs performed, revenues earned, and profits derived from competitive activity since October 9, 2025;

(l) Awarding Plaintiffs their reasonable attorneys' fees and costs of this action pursuant to, among other authorities, Section 10 of the Non-Compete Agreement, 18 U.S.C. § 1836(b)(3)(D), Florida Statutes § 542.335(1)(k), Florida Statutes § 688.005, and Florida Statutes § 772.11;

(m) Awarding Plaintiffs pre-judgment and post-judgment interest at the maximum rate permitted by law; and

(n) Granting such other and further relief as this Court deems just, equitable, and proper.

Dated: July 13, 2026

Respectfully submitted,

By: /s/ David H. Haft
David H. Haft, Esq.
DAVID H. HAFT, P.A.
1526 Cardinal Way, Suite A
Weston, FL 33327
Tel: (954) 459-1358
Email: david@dhaftlaw.com
*Attorneys for Plaintiffs CJ's Power Systems, Inc. and Paramount Power, Inc.*